## CRAIG ET AL. *v.* BOREN, GOVERNOR OF OKLAHOMA, ET AL.

No. 75–628.   Argued October 5, 1976—Decided December 20, 1976

*Frederick P. Gilbert* argued the cause and filed briefs for appellants.

*James H. Gray,* Assistant Attorney General of Oklahoma, argued the cause for appellees. With him on the brief was *Larry Derryberry,* Attorney General.*

Mr. Justice Brennan delivered the opinion of the Court.

The interaction of two sections of an Oklahoma statute, Okla. Stat., Tit. 37, §§ 241 and 245 (1958 and Supp. 1976),[1]

---

*Ruth Bader Ginsburg* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

[1] Sections 241 and 245 provide in pertinent part:

§ 241. "It shall be unlawful for any person who holds a license to sell and dispense beer . . . to sell, barter or give to any minor any beverage containing more than one-half of one per cent of alcohol measured by volume and not more than three and two-tenths (3.2) per cent of alcohol measured by weight.

§ 245. "A 'minor,' for the purposes of Section . . . 241 . . . is defined as a

prohibits the sale of "nonintoxicating" 3.2% beer to males under the age of 21 and to females under the age of 18. The question to be decided is whether such a gender-based differential constitutes a denial to males 18–20 years of age of the equal protection of the laws in violation of the Fourteenth Amendment.

This action was brought in the District Court for the Western District of Oklahoma on December 20, 1972, by appellant Craig, a male then between 18 and 21 years of age, and by appellant Whitener, a licensed vendor of 3.2% beer. The complaint sought declaratory and injunctive relief against enforcement of the gender-based differential on the ground that it constituted invidious discrimination against males 18–20 years of age. A three-judge court convened under 28 U. S. C. § 2281 sustained the constitutionality of the statutory differential and dismissed the action. 399 F. Supp. 1304 (1975). We noted probable jurisdiction of appellants' appeal, 423 U. S. 1047 (1976). We reverse.

## I

We first address a preliminary question of standing. Appellant Craig attained the age of 21 after we noted probable jurisdiction. Therefore, since only declaratory and injunctive relief against enforcement of the gender-based differential is sought, the controversy has been rendered moot as to Craig. See, e. g., DeFunis v. Odegaard, 416 U. S. 312 (1974).[2] The question thus arises whether appellant Whitener, the licensed vendor of 3.2% beer, who has a live controversy against enforcement of the statute, may rely upon the equal protection objections of males 18–20 years of age to establish her claim of

female under the age of eighteen (18) years, and a male under the age of twenty-one (21) years."

[2] Appellants did not seek class certification of Craig as representative of other similarly situated males 18–20 years of age. See, e. g., Sosna v. Iowa, 419 U. S. 393, 401 (1975).

unconstitutionality of the age-sex differential. We conclude that she may.

Initially, it should be noted that, despite having had the opportunity to do so,[3] appellees never raised before the District Court any objection to Whitener's reliance upon the claimed unequal treatment of 18–20-year-old males as the premise of her equal protection challenge to Oklahoma's 3.2% beer law. See 399 F. Supp., at 1306 n. 1. Indeed, at oral argument Oklahoma acknowledged that appellees always "presumed" that the vendor, subject to sanctions and loss of license for violation of the statute, was a proper party in interest to object to the enforcement of the sex-based regulatory provision. Tr. of Oral Arg. 41. While such a concession certainly would not be controlling upon the reach of this Court's constitutional authority to exercise jurisdiction under Art. III, see, e. g., Sierra Club v. Morton, 405 U. S. 727, 732 n. 3 (1972); cf. Data Processing Service v. Camp, 397 U. S. 150, 151 (1970), our decisions have settled that limitations on a litigant's assertion of jus tertii are not constitutionally mandated, but rather stem from a salutary "rule of self-restraint" designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative. See, e. g., Barrows v. Jackson, 346 U. S. 249, 255, 257 (1953); see also Singleton v. Wulff, 428 U. S. 106, 123–124 (1976) (POWELL, J., dissenting). These prudential objectives, thought to be enhanced by restrictions on third-party standing, cannot be furthered here, where the lower court already has entertained the relevant constitutional challenge and the parties have sought—or at least have never resisted—an authoritative constitutional determination. In such circumstances, a decision by us to forgo

---

[3] The District Court's opinion confirms that Whitener from the outset has based her constitutional challenge on gender-discrimination grounds, 399 F. Supp., at 1306, and "[n]o challenge is made to [her] standing and requisite interest in the controversy . . . ." Id., at 1306 n. 1.

consideration of the constitutional merits in order to await the initiation of a new challenge to the statute by injured third parties would be impermissibly to foster repetitive and time-consuming litigation under the guise of caution and prudence. Moreover, insofar as the applicable constitutional questions have been and continue to be presented vigorously and "cogently," *Holden* v. *Hardy,* 169 U. S. 366, 397 (1898), the denial of *jus tertii* standing in deference to a direct class suit can serve no functional purpose. Our Brother BLACKMUN's comment is pertinent: "[I]t may be that a class could be assembled, whose fluid membership always included some [males] with live claims. But if the assertion of the right is to be 'representative' to such an extent anyway, there seems little loss in terms of effective advocacy from allowing its assertion by" the present *jus tertii* champion. *Singleton* v. *Wulff, supra,* at 117–118.

In any event, we conclude that appellant Whitener has established independently her claim to assert *jus tertii* standing. The operation of §§ 241 and 245 plainly has inflicted "injury in fact" upon appellant sufficient to guarantee her "concrete adverseness," *Baker* v. *Carr,* 369 U. S. 186, 204 (1962), and to satisfy the constitutionally based standing requirements imposed by Art. III. The legal duties created by the statutory sections under challenge are addressed directly to vendors such as appellant. She is obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of her buyers' market, or to disobey the statutory command and suffer, in the words of Oklahoma's Assistant Attorney General, "sanctions and perhaps loss of license." Tr. of Oral Arg. 41. This Court repeatedly has recognized that such injuries establish the threshold requirements of a "case or controversy" mandated by Art. III. See, *e. g., Singleton* v. *Wulff, supra,* at 113 (doctors who receive payments for their abortion services are "classically adverse" to government as payer); *Sullivan* v. *Little Hunting*

*Park,* 396 U. S. 229, 237 (1969); *Barrows* v. *Jackson, supra,* at 255–256.

As a vendor with standing to challenge the lawfulness of §§ 241 and 245, appellant Whitener is entitled to assert those concomitant rights of third parties that would be "diluted or adversely affected" should her constitutional challenge fail and the statutes remain in force. *Griswold* v. *Connecticut,* 381 U. S. 479, 481 (1965); see Note, Standing to Assert Constitutional Jus Tertii, 88 Harv. L. Rev. 423, 432 (1974). Otherwise, the threatened imposition of governmental sanctions might deter appellant Whitener and other similarly situated vendors from selling 3.2% beer to young males, thereby ensuring that "enforcement of the challenged restriction against the [vendor] would result indirectly in the violation of third parties' rights." *Warth* v. *Seldin,* 422 U. S. 490, 510 (1975). Accordingly, vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function. See, *e. g., Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); *Sullivan* v. *Little Hunting Park, supra; Barrows* v. *Jackson, supra.*[4]

---

[4] The standing question presented here is not answered by the principle stated in *United States* v. *Raines,* 362 U. S. 17, 21 (1960), that "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." In *Raines,* the Court refused to permit certain public officials of Georgia to defend against application of the Civil Rights Act to their official conduct on the ground that the statute also might be construed to encompass the "purely private actions" of others. The *Raines* rule remains germane in such a setting, where the interests of the litigant and the rights of the proposed third parties are in no way mutually interdependent. Thus, a successful suit against Raines did not threaten to impair or diminish the independent private rights of others, and consequently, consideration of those third-party rights properly was deferred until another day.

Of course, the *Raines* principle has also been relaxed where legal action

Indeed, the *jus tertii* question raised here is answered by our disposition of a like argument in *Eisenstadt* v. *Baird, supra.* There, as here, a state statute imposed legal duties and disabilities upon the claimant, who was convicted of distributing a package of contraceptive foam to a third party.[5] Since the statute was directed at Baird and penalized his conduct, the Court did not hesitate—again as here—to conclude that the "case or controversy" requirement of Art. III was satisfied. 405 U. S., at 443. In considering Baird's constitutional objections, the Court fully recognized his standing to defend the privacy interests of third parties. Deemed crucial to the decision to permit *jus tertii* standing was the recognition of "the impact of the litigation on the third-party interests." *Id.,* at 445. Just as the defeat of Baird's suit and the "[e]nforcement of the Massachusetts statute will materially impair the ability of single persons to obtain contraceptives," *id.,* at 446, so too the failure of Whitener to prevail in this suit and the continued enforcement of §§ 241 and 245 will "materially impair the ability of" males 18–20 years of age to purchase 3.2% beer despite their classification by an overt gender-based criterion. Similarly, just as the Massachusetts law in *Eisenstadt* "prohibit[ed],

---

against the claimant threatens to "chill" the First Amendment rights of third parties. See, *e. g., Lewis* v. *New Orleans,* 415 U. S. 130 (1974).

[5] The fact that Baird chose to disobey the legal duty imposed upon him by the Massachusetts anticontraception statute, resulting in his criminal conviction, 405 U. S., at 440, does not distinguish the standing inquiry from that pertaining to the anticipatory attack in this case. In both *Eisenstadt* and here, the challenged statutes compel *jus tertii* claimants either to cease their proscribed activities or to suffer appropriate sanctions. The existence of Art. III "injury in fact" and the structure of the claimant's relationship to the third parties are not altered by the litigative posture of the suit. And, certainly, no suggestion will be heard that Whitener's anticipatory challenge offends the normal requirements governing such actions. See generally *Steffel* v. *Thompson,* 415 U. S. 452 (1974); *Samuels* v. *Mackell,* 401 U. S. 66 (1971); *Younger* v. *Harris,* 401 U. S. 37 (1971).

not use, but distribution," 405 U. S., at 446, and consequently the least awkward challenger was one in Baird's position who was subject to that proscription, the law challenged here explicitly regulates the sale rather than use of 3.2% beer, thus leaving a vendor as the obvious claimant.

We therefore hold that Whitener has standing to raise relevant equal protection challenges to Oklahoma's gender-based law. We now consider those arguments.

## II

## A

Before 1972, Oklahoma defined the commencement of civil majority at age 18 for females and age 21 for males. Okla. Stat., Tit. 15, § 13 (1972 and Supp. 1976). In contrast, females were held criminally responsible as adults at age 18 and males at age 16. Okla. Stat., Tit. 10, § 1101 (a) (Supp. 1976). After the Court of Appeals for the Tenth Circuit held in 1972, on the authority of *Reed* v. *Reed,* 404 U. S. 71 (1971), that the age distinction was unconstitutional for purposes of establishing criminal responsibility as adults, *Lamb* v. *Brown,* 456 F. 2d 18, the Oklahoma Legislature fixed age 18 as applicable to both males and females. Okla. Stat., Tit. 10, § 1101 (a) (Supp. 1976). In 1972, 18 also was established as the age of majority for males and females in civil matters, Okla. Stat., Tit. 15, § 13 (1972 and Supp. 1976), except that §§ 241 and 245 of the 3.2% beer statute were simultaneously codified to create an exception to the gender-free rule.

Analysis may appropriately begin with the reminder that *Reed* emphasized that statutory classifications that distinguish between males and females are "subject to scrutiny under the Equal Protection Clause." 404 U. S., at 75. To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives. Thus, in *Reed,* the ob-

jectives of "reducing the workload on probate courts," *id.,* at 76, and "avoiding intrafamily controversy," *id.,* at 77, were deemed of insufficient importance to sustain use of an overt gender criterion in the appointment of administrators of intestate decedents' estates. Decisions following *Reed* similarly have rejected administrative ease and convenience as sufficiently important objectives to justify gender-based classifications. See, *e. g., Stanley* v. *Illinois,* 405 U. S. 645, 656 (1972); *Frontiero* v. *Richardson,* 411 U. S. 677, 690 (1973); cf. *Schlesinger* v. *Ballard,* 419 U. S. 498, 506–507 (1975). And only two Terms ago, *Stanton* v. *Stanton,* 421 U. S. 7 (1975), expressly stating that *Reed* v. *Reed* was "controlling," 421 U. S., at 13, held that *Reed* required invalidation of a Utah differential age-of-majority statute, notwithstanding the statute's coincidence with and furtherance of the State's purpose of fostering "old notions" of role typing and preparing boys for their expected performance in the economic and political worlds. 421 U. S., at 14–15.[6]

*Reed* v. *Reed* has also provided the underpinning for decisions that have invalidated statutes employing gender as an inaccurate proxy for other, more germane bases of classification. Hence, "archaic and overbroad" generalizations, *Schlesinger* v. *Ballard, supra,* at 508, concerning the financial position of servicewomen, *Frontiero* v. *Richardson, supra,* at 689 n. 23, and working women, *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 643 (1975), could not justify use of a gender line in determining eligibility for certain governmental entitlements. Similarly, increasingly outdated

---

[6] *Kahn* v. *Shevin,* 416 U. S. 351 (1974) and *Schlesinger* v. *Ballard,* 419 U. S. 498 (1975), upholding the use of gender-based classifications, rested upon the Court's perception of the laudatory purposes of those laws as remedying disadvantageous conditions suffered by women in economic and military life. See 416 U. S., at 353–354; 419 U. S., at 508. Needless to say, in this case Oklahoma does not suggest that the age-sex differential was enacted to ensure the availability of 3.2% beer for women as compensation for previous deprivations.

misconceptions concerning the role of females in the home rather than in the "marketplace and world of ideas" were rejected as loose-fitting characterizations incapable of supporting state statutory schemes that were premised upon their accuracy. *Stanton* v. *Stanton, supra; Taylor* v. *Louisiana,* 419 U. S. 522, 535 n. 17 (1975). In light of the weak congruence between gender and the characteristic or trait that gender purported to represent, it was necessary that the legislatures choose either to realign their substantive laws in a gender-neutral fashion, or to adopt procedures for identifying those instances where the sex-centered generalization actually comported with fact. See, *e. g., Stanley* v. *Illinois, supra,* at 658; cf. *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632, 650 (1974).

In this case, too, *"Reed,* we feel, is controlling . . . ," *Stanton* v. *Stanton, supra,* at 13. We turn then to the question whether, under *Reed,* the difference between males and females with respect to the purchase of 3.2% beer warrants the differential in age drawn by the Oklahoma statute. We conclude that it does not.

## B

The District Court recognized that *Reed* v. *Reed* was controlling. In applying the teachings of that case, the court found the requisite important governmental objective in the traffic-safety goal proffered by the Oklahoma Attorney General. It then concluded that the statistics introduced by the appellees established that the gender-based distinction was substantially related to achievement of that goal.

## C

We accept for purposes of discussion the District Court's identification of the objective underlying §§ 241 and 245 as the enhancement of traffic safety.[7] Clearly, the protection

---

[7] That this was the true purpose is not at all self-evident. The pur-

of public health and safety represents an important function of state and local governments  However, appellees' statistics in our view cannot support the conclusion that the gender-based distinction closely serves to achieve that objective and therefore the distinction cannot under *Reed* withstand equal protection challenge.

The appellees introduced a variety of statistical surveys. First, an analysis of arrest statistics for 1973 demonstrated that 18–20-year-old male arrests for "driving under the influence" and "drunkenness" substantially exceeded female arrests for that same age period.[8]   Similarly, youths aged 17–21 were found to be overrepresented among those killed

pose is not apparent from the face of the statute and the Oklahoma Legislature does not preserve statutory history materials capable of clarifying the objectives served by its legislative enactments.   The District Court acknowledged the nonexistence of materials necessary "to reveal what the actual purpose of the legislature was," but concluded that "we feel it apparent that a major purpose of the legislature was to promote the safety of the young persons affected and the public generally." 399 F. Supp., at 1311 n. 6.  Similarly, the attorney for Oklahoma, while proposing traffic safety as a legitimate rationale for the 3.2% beer law, candidly acknowledged at oral argument that he is unable to assert that traffic safety is "indeed the reason" for the gender line contained in § 245.  Tr. of Oral Arg. 27.  For this appeal we find adequate the appellee's representation of legislative purpose, leaving for another day consideration of whether the statement of the State's Assistant Attorney General should suffice to inform this Court of the legislature's objectives, or whether the Court must determine if the litigant simply is selecting a convenient, but false, *post hoc* rationalization.

[8] The disparities in 18–20-year-old male-female arrests were substantial for both categories of offenses: 427 versus 24 for driving under the influence of alcohol, and 966 versus 102 for drunkenness.  Even if we assume that a legislature may rely on such arrest data in some situations, these figures do not offer support for a differential age line, for the disproportionate arrests of males persisted at older ages; indeed, in the case of arrests for drunkenness, the figures for all ages indicated "even more male involvement in such arrests at later ages." 399 F. Supp., at 1309.  See also n. 14, *infra*.

or injured in traffic accidents, with males again numerically exceeding females in this regard.[9] Third, a random roadside survey in Oklahoma City revealed that young males were more inclined to drive and drink beer than were their female counterparts.[10] Fourth, Federal Bureau of Investigation nationwide statistics exhibited a notable increase in arrests for "driving under the influence."[11] Finally, statistical evidence gathered in other jurisdictions, particularly Minnesota and Michigan, was offered to corroborate Oklahoma's experience by indicating the pervasiveness of youthful participation in motor vehicle accidents following the imbibing of alcohol. Conceding that "the case is not free from doubt," 399 F. Supp., at 1314, the District Court nonetheless concluded that this statistical showing substantiated "a rational basis for the legislative judgment underlying the challenged classification." *Id.*, at 1307.

Even were this statistical evidence accepted as accurate, it nevertheless offers only a weak answer to the equal protection question presented here. The most focused and relevant of the statistical surveys, arrests of 18–20-year-olds for alcohol-related driving offenses, exemplifies the ultimate unpersuasiveness of this evidentiary record. Viewed in terms of the correlation between sex and the actual activity that Oklahoma seeks to regulate—driving while under the influence of alcohol—the statistics broadly establish that .18% of females and 2% of males in that age group were arrested for that offense. While such a disparity is not trivial in a statistical sense, it hardly can form the basis for employment of a gender line as a classifying device. Certainly if male-

---

[9] This survey drew no correlation between the accident figures for any age group and levels of intoxication found in those killed or injured.

[10] For an analysis of the results of this exhibit, see n. 16, *infra*.

[11] The FBI made no attempt to relate these arrest figures either to beer drinking or to an 18–21 age differential, but rather found that male arrests for all ages exceeded 90% of the total.

ness is to serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous "fit." [12] Indeed, prior cases have consistently rejected the use of sex as a decisionmaking factor even though the statutes in question certainly rested on far more predictive empirical relationships than this.[13]

Moreover, the statistics exhibit a variety of other shortcomings that seriously impugn their value to equal protection analysis. Setting aside the obvious methodological problems,[14] the surveys do not adequately justify the salient

[12] Obviously, arrest statistics do not embrace all individuals who drink and drive. But for purposes of analysis, this "underinclusiveness" must be discounted somewhat by the shortcomings inherent in this statistical sample, see n. 14, *infra.* In any event, we decide this case in light of the evidence offered by Oklahoma and know of no way of extrapolating these arrest statistics to take into account the driving and drinking population at large, including those who avoided arrest.

[13] For example, we can conjecture that in *Reed,* Idaho's apparent premise that women lacked experience in formal business matters (particularly compared to men) would have proved to be accurate in substantially more than 2% of all cases. And in both *Frontiero* and *Wiesenfeld,* we expressly found appellees' empirical defense of mandatory dependency tests for men but not women to be unsatisfactory, even though we recognized that husbands are still far less likely to be dependent on their wives than vice versa. See, *e. g.,* 411 U. S., at 688–690.

[14] The very social stereotypes that find reflection in age-differential laws, see *Stanton* v. *Stanton,* 421 U. S., 7, 14–15 (1975), are likely substantially to distort the accuracy of these comparative statistics. Hence "reckless" young men who drink and drive are transformed into arrest statistics, whereas their female counterparts are chivalrously escorted home. See, *e. g.,* W. Reckless & B. Kay, The Female Offender 4, 7, 13, 16–17 (Report to Presidential Commission on Law Enforcement and Administration of Justice, 1967). Moreover, the Oklahoma surveys, gathered under a regime where the age-differential law in question has been in effect, are lacking in controls necessary for appraisal of the actual effectiveness of the male 3.2% beer prohibition. In this regard, the disproportionately high arrest statistics for young males—and, indeed, the growing alcohol-related arrest figures for all ages and sexes—simply may be taken to document the relative futility of controlling driving behavior by the 3.2% beer

features of Oklahoma's gender-based traffic-safety law. None purports to measure the use and dangerousness of 3.2% beer as opposed to alcohol generally, a detail that is of particular importance since, in light of its low alcohol level, Oklahoma apparently considers the 3.2% beverage to be "nonintoxicating." Okla. Stat., Tit. 37, § 163.1 (1958); see *State ex rel. Springer* v. *Bliss*, 199 Okla. 198, 185 P. 2d 220 (1947). Moreover, many of the studies, while graphically documenting the unfortunate increase in driving while under the influence of alcohol, make no effort to relate their findings to age-sex differentials as involved here.[15]  Indeed, the only survey that explicitly centered its attention upon young drivers and their use of beer—albeit apparently not of the diluted 3.2% variety—reached results that hardly can be viewed as impressive in justifying either a gender or age classification.[16]

---

statute and like legislation, although we obviously have no means of estimating how many individuals, if any, actually were prevented from drinking by these laws.

[15] See, *e. g.*, nn. 9 and 11, *supra.*  See also n. 16, *infra.*

[16] The random roadside survey of drivers conducted in Oklahoma City during August 1972 found that 78% of drivers under 20 were male. Turning to an evaluation of their drinking habits and factoring out nondrinkers, 84% of the males versus 77% of the females expressed a preference for beer.  Further 16.5% of the men and 11.4% of the women had consumed some alcoholic beverage within two hours of the interview. Finally, a blood alcohol concentration greater than .01% was discovered in 14.6% of the males compared to 11.5% of the females.  "The 1973 figures, although they contain some variations, reflect essentially the same pattern."  399 F. Supp., at 1309.  Plainly these statistical disparities between the sexes are not substantial.  Moreover, when the 18–20 age boundaries are lifted and all drivers analyzed, the 1972 roadside survey indicates that male drinking rose slightly whereas female exposure to alcohol remained relatively constant.  Again, in 1973, the survey established that "compared to all drivers interviewed, . . . the under-20 age group generally showed a lower involvement with alcohol in terms of having drunk within the past two hours or having a significant BAC (blood alcohol content)."  *Ibid.*  In sum, this survey provides little support for a gender line among teenagers and actually runs counter to the imposition of drinking restrictions based upon age.

There is no reason to belabor this line of analysis. It is unrealistic to expect either members of the judiciary or state officials to be well versed in the rigors of experimental or statistical technique. But this merely illustrates that proving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause.[17] Suffice to say that the showing offered by the appellees does not satisfy us that sex represents a legitimate, accurate proxy for the regulation of drinking and driving. In fact, when it is further recognized that Oklahoma's statute prohibits only the selling of 3.2% beer to young males and not their drinking the beverage once acquired (even after purchase by their 18–20-year-old female companions), the relationship between gender and traffic safety becomes far too tenuous to satisfy *Reed*'s requirement that the gender-based difference be substantially related to achievement of the statutory objective.

We hold, therefore, that under *Reed*, Oklahoma's 3.2% beer statute invidiously discriminates against males 18–20 years of age.

· D

Appellees argue, however, that §§ 241 and 245 enforce state policies concerning the sale and distribution of alcohol and by force of the Twenty-first Amendment should therefore be held to withstand the equal protection challenge. The District Court's response to this contention is unclear. The court assumed that the Twenty-first Amendment "strengthened" the State's police powers with respect to alcohol regulation, 399 F. Supp., at 1307, but then said that "the standards of review that [the Equal Protection Clause] mandates are not relaxed." *Id.*, at 1308. Our view is, and we hold, that the Twenty-first Amendment does not save the

[17] See, *e. g.,* n. 22, *infra.*

invidious gender-based discrimination from invalidation as a denial of equal protection of the laws in violation of the Fourteenth Amendment.

The history of state regulation of alcoholic beverages dates from long before adoption of the Eighteenth Amendment. In the *License Cases,* 5 How. 504, 579 (1847), the Court recognized a broad authority in state governments to regulate the trade of alcoholic beverages within their borders free from implied restrictions under the Commerce Clause. Later in the century, however, *Leisy* v. *Hardin,* 135 U. S. 100 (1890), undercut the theoretical underpinnings of the *License Cases.* This led Congress, acting pursuant to its powers under the Commerce Clause, to reinvigorate the State's regulatory role through the passage of the Wilson [18] and Webb-Kenyon Acts.[19] See, *e. g., Clark Distilling Co.* v. *Western Maryland R. Co.,* 242 U. S. 311 (1917) (upholding Webb-Kenyon Act); *In re Rahrer,* 140 U. S. 545 (1891) (upholding Wilson Act). With passage of the Eighteenth Amendment, the uneasy tension between the Commerce Clause and state police power temporarily subsided.

The Twenty-first Amendment repealed the Eighteenth Amendment in 1933. The wording of § 2 of the Twenty-first Amendment [20] closely follows the Webb-Kenyon and Wil-

---

[18] The Wilson Act, enacted in 1890, reads in pertinent part: "All . . . intoxicating liquors or liquids transported into any State or Territory . . . shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory . . . ." 27 U. S. C. § 121.

[19] The Webb-Kenyon Act of 1913 prohibits "[t]he shipment or transportation . . . of any . . . intoxicating liquor of any kind, from one State, Territory, or District . . . into any other State, Territory, or District . . . [for the purpose of being] received, possessed, sold, or in any manner used . . . in violation of any law of such State, Territory, or District . . . ." 27 U. S. C. § 122.

[20] "The transportation or importation into any State, Territory, or

son Acts, expressing the framers' clear intention of constitutionalizing the Commerce Clause framework established under those statutes. This Court's decisions since have confirmed that the Amendment primarily created an exception to the normal operation of the Commerce Clause. See, e. g., *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.,* 377 U. S. 324, 330 (1964); *Carter* v. *Virginia,* 321 U. S. 131, 139–140 (1944) (Frankfurter, J., concurring); *Finch & Co.* v. *McKittrick,* 305 U. S. 395, 398 (1939). Even here, however, the Twenty-first Amendment does not *pro tanto* repeal the Commerce Clause, but merely requires that each provision "be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case." *Hostetter* v. *Idlewild Bon Voyage Liquor Corp., supra,* at 332; cf. *Department of Revenue* v. *James Beam Distilling Co.,* 377 U. S. 341 (1964); *Collins* v. *Yosemite Park & Curry Co.,* 304 U. S. 518 (1938).

Once passing beyond consideration of the Commerce Clause, the relevance of the Twenty-first Amendment to other constitutional provisions becomes increasingly doubtful. As one commentator has remarked: "Neither the text nor the history of the Twenty-first Amendment suggests that it qualifies individual rights protected by the Bill of Rights and the Fourteenth Amendment where the sale or use of liquor is concerned." P. Brest, Processes of Constitutional Decisionmaking, Cases and Materials, 258 (1975). Any departures from this historical view have been limited and sporadic. Two States successfully relied upon the Twenty-first Amendment to respond to challenges of major liquor importers to state authority to regulate the importation and manufacture of alcoholic beverages on Commerce Clause and Fourteenth Amendment grounds. See *Mahoney* v. *Joseph Triner Corp.,* 304 U. S. 401 (1938); *State Board* v. *Young's Market Co.,*

---

possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

299 U. S. 59, 64 (1936). In fact, however, the arguments in both cases centered upon importation of intoxicants, a regulatory area where the State's authority under the Twenty-first Amendment is transparently clear, *Hostetter* v. *Idlewild Bon Voyage Liquor Corp., supra,* at 330, and n. 9, and touched upon purely economic matters that traditionally merit only the mildest review under the Fourteenth Amendment, see, *e. g., Joseph E. Seagram & Sons* v. *Hostetter,* 384 U. S. 35, 47–48, 50–51 (1966) (rejecting Fourteenth Amendment objections to state liquor laws on the strength of *Ferguson* v. *Skrupa,* 372 U. S. 726, 729–730 (1963) and *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955)).[21] Cases involving individual rights protected by the Due Process Clause have been treated in sharp contrast. For example, when an individual objected to the mandatory "posting" of her name in retail liquor establishments and her characterization as an "excessive drink[er]," the Twenty-first Amendment was held not to qualify the scope of her due process rights. *Wisconsin* v. *Constantineau,* 400 U. S. 433, 436 (1971).

It is true that *California* v. *LaRue,* 409 U. S. 109, 115 (1972), relied upon the Twenty-first Amendment to "strengthen" the State's authority to regulate live entertainment at establishments licensed to dispense liquor, at least when the performances "partake more of gross sexuality than of communication," *id.,* at 118. Nevertheless, the Court has never recognized sufficient "strength" in the Amendment to defeat an otherwise established claim of invidious discrimination in violation of the Equal Protection Clause.

---

[21] The dictum contained in *State Board* v. *Young's Market Co.,* 299 U. S. 59, 64 (1936), that "[a] classification recognized by the Twenty-first Amendment cannot be deemed forbidden by the Fourteenth," is inapplicable to this case. The Twenty-first Amendment does not recognize, even indirectly, classifications based upon gender. And, as the accompanying text demonstrates, that statement has not been relied upon in recent cases that have considered Fourteenth Amendment challenges to state liquor regulation.

Rather, *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 178–179 (1972), establishes that state liquor regulatory schemes cannot work invidious discriminations that violate the Equal Protection Clause.

Following this approach, both federal and state courts uniformly have declared the unconstitutionality of gender lines that restrain the activities of customers of state-regulated liquor establishments irrespective of the operation of the Twenty-first Amendment. See, *e. g., White* v. *Fleming,* 522 F. 2d 730 (CA7 1975); *Women's Liberation Union of R. I.* v. *Israel,* 512 F. 2d 106 (CA1 1975); *Daugherty* v. *Daley,* 370 F. Supp. 338 (ND Ill. 1974) (three-judge court); *Seidenberg* v. *McSorleys' Old Ale House, Inc.,* 317 F. Supp. 593 (SDNY 1970); *Commonwealth Alcoholic Beverage Control Bd.* v. *Burke,* 481 S. W. 2d 52 (Ky. 1972); cf. *Sail'er Inn, Inc.* v. *Kirby,* 5 Cal. 3d 1, 485 P. 2d 529 (1971); *Paterson Tavern & G. O. A.* v. *Hawthorne,* 57 N. J. 180, 270 A. 2d 628 (1970). Even when state officials have posited sociological or empirical justifications for these gender-based differentiations, the courts have struck down discriminations aimed at an entire class under the guise of alcohol regulation. In fact, social science studies that have uncovered quantifiable differences in drinking tendencies dividing along both racial and ethnic lines strongly suggest the need for application of the Equal Protection Clause in preventing discriminatory treatment that almost certainly would be perceived as invidious.[22] In sum, the principles embodied in the Equal

---

[22] Thus, if statistics were to govern the permissibility of state alcohol regulation without regard to the Equal Protection Clause as a limiting principle, it might follow that States could freely favor Jews and Italian Catholics at the expense of all other Americans, since available studies regularly demonstrate that the former two groups exhibit the lowest rates of problem drinking. See, *e. g.,* Haberman & Sheinberg, Implicative Drinking Reported in a Household Survey: A Corroborative Note on Subgroup Differences, 28 Q. J. Studies on Alcohol 538 (1967); Wechsler, Thum, Demone, & Dwinnell, Social Characteristics and Blood Alcohol Level, 33 Q. J. Studies on Alcohol 132, 141–142 (1972); Wechsler,

Protection Clause are not to be rendered inapplicable by statistically measured but loose-fitting generalities concerning the drinking tendencies of aggregate groups. We thus hold that the operation of the Twenty-first Amendment does not alter the application of equal protection standards that otherwise govern this case.

---

Demone, Thum, & Kasey, Religious-Ethnic Differences In Alcohol Consumption, 11 J. Health & Soc. Behavior 21, 28 (1970); Schmidt & Popham, Impressions of Jewish Alcoholics, 37 J. Studies on Alcohol 931 (1976). Similarly, if a State were allowed simply to depend upon demographic characteristics of adolescents in identifying problem drinkers, statistics might support the conclusion that only black teenagers should be permitted to drink, followed by Asian-Americans and Spanish-Americans. "Whites and American Indians have the lowest proportions of abstainers and the highest proportions of moderate/heavy and heavy drinkers." Summary of Final Report of a National Study of Adolescent Drinking Behavior, Attitudes and Correlates 147–148 (Center for the Study of Social Behavior, Research Triangle Inst., Apr. 1975) (percentage of moderate/heavy and heavy adolescent drinkers by race: black 15.2%; Asian-American 18.3%; Spanish-American 22.7%; white 25.3%; American Indian 28.1%).

In the past, some States have acted upon their notions of the drinking propensities of entire groups in fashioning their alcohol policies. The most typical recipient of this treatment has been the American Indian; indeed, several States established criminal sanctions for the sale of alcohol to an Indian or "half or quarter breed Indian." See, e. g., Fla. Stat. Ann. § 569.07 (1962 and 1976 Supp.) (repealed in 1972); Iowa Code Ann. § 732.5 (1950 and 1976 Supp.) (repealed in 1967); Minn. Stat. Ann. § 340.82 (1957) (repealed in 1969); Neb. Rev. Stat. 53–181 (1944) (repealed in 1955); Utah Code Ann. § 76–34–1 (1953 and 1975 Supp.) (repealed in 1955). Other statutes and constitutional provisions proscribed the introduction of alcoholic beverages onto Indian reservations. See, e. g., Act of June 10, 1910, § 2, 36 Stat. 558; Ariz. Const., Art. XX, § 3; N. M. Const., Art. XXI, § 8; Okla. Const., Art. 1, § 7. While Indian-oriented provisions were the most common, state alcohol beverage prohibitions also have been directed at other groups, notably German, Italian, and Catholic immigrants. See, e. g., J. Higham, Strangers in the Land 25, 267–268, 295 (1975). The repeal of most of these laws signals society's perception of the unfairness and questionable constitutionality of singling out groups to bear the brunt of alcohol regulation.

We conclude that the gender-based differential contained in Okla. Stat., Tit. 37, § 245 (1976 Supp.) constitutes a denial of the equal protection of the laws to males aged 18–20 [23] and reverse the judgment of the District Court.[24]

*It is so ordered.*

MR. JUSTICE POWELL, concurring.

I join the opinion of the Court as I am in general agreement with it. I do have reservations as to some of the discussion concerning the appropriate standard for equal protection analysis and the relevance of the statistical evidence. Accordingly, I add this concurring statement.

With respect to the equal protection standard, I agree that *Reed* v. *Reed,* 404 U. S. 71 (1971), is the most relevant precedent. But I find it unnecessary, in deciding this case, to read that decision as broadly as some of the Court's language may imply. *Reed* and subsequent cases involving gender-based classifications make clear that the Court subjects such classifications to a more critical examination than is normally applied when "fundamental" constitutional rights and "suspect classes" are not present.*

---

[23] Insofar as *Goesaert* v. *Cleary,* 335 U. S. 464 (1948), may be inconsistent, that decision is disapproved. Undoubtedly reflecting the view that *Goesaert*'s equal protection analysis no longer obtains, the District Court made no reference to that decision in upholding Oklahoma's statute. Similarly, the opinions of the federal and state courts cited earlier in the text invalidating gender lines with respect to alcohol regulation uniformly disparaged the contemporary vitality of *Goesaert.*

[24] As noted in *Stanton* v. *Stanton,* 421 U. S., at 17–18, the Oklahoma Legislature is free to redefine any cutoff age for the purchase and sale of 3.2% beer that it may choose, provided that the redefinition operates in a gender-neutral fashion.

*As is evident from our opinions, the Court has had difficulty in agreeing upon a standard of equal protection analysis that can be applied consistently to the wide variety of legislative classifications. There are valid reasons for dissatisfaction with the "two-tier" approach that has been prominent in the Court's decisions in the past decade. Although viewed by many as a result-oriented substitute for more critical analysis, that

I view this as a relatively easy case. No one questions the legitimacy or importance of the asserted governmental objective: the promotion of highway safety. The decision of the case turns on whether the state legislature, by the classification it has chosen, has adopted a means that bears a " 'fair and substantial relation' " to this objective. *Id.*, at 76, quoting *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920).

It seems to me that the statistics offered by appellees and relied upon by the District Court do tend generally to support the view that young men drive more, possibly are inclined to drink more, and—for various reasons—are involved in more accidents than young women. Even so, I am not persuaded that these facts and the inferences fairly drawn from them justify this classification based on a three-year age differential between the sexes, and especially one that is so easily circumvented as to be virtually meaningless. Putting it differently, this gender-based classification does not bear a fair and substantial relation to the object of the legislation.

Mr. Justice Stevens, concurring.

There is only one Equal Protection Clause. It requires every State to govern impartially. It does not direct the

approach—with its narrowly limited "upper-tier"—now has substantial precedential support. As has been true of *Reed* and its progeny, our decision today will be viewed by some as a "middle-tier" approach. While I would not endorse that characterization and would not welcome a further subdividing of equal protection analysis, candor compels the recognition that the relatively deferential "rational basis" standard of review normally applied takes on a sharper focus when we address a gender-based classification. So much is clear from our recent cases. For thoughtful discussions of equal protection analysis, see, *e. g.,* Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for A Newer Equal Protection, 86 Harv. L. Rev. 1 (1972); Wilkinson, The Supreme Court, the Equal Protection Clause, and the Three Faces of Constitutional Equality, 61 Va. L. Rev. 945 (1975).

courts to apply one standard of review in some cases and a different standard in other cases. Whatever criticism may be leveled at a judicial opinion implying that there are at least three such standards applies with the same force to a double standard.

I am inclined to believe that what has become known as the two-tiered analysis of equal protection claims does not describe a completely logical method of deciding cases, but rather is a method the Court has employed to explain decisions that actually apply a single standard in a reasonably consistent fashion. I also suspect that a careful explanation of the reasons motivating particular decisions may contribute more to an identification of that standard than an attempt to articulate it in all-encompassing terms. It may therefore be appropriate for me to state the principal reasons which persuaded me to join the Court's opinion.

In this case, the classification is not as obnoxious as some the Court has condemned,[1] nor as inoffensive as some the Court has accepted. It is objectionable because it is based on an accident of birth,[2] because it is a mere remnant of the now almost universally rejected tradition of discriminating against males in this age bracket,[3] and because, to the extent it reflects any physical difference between males and

---

[1] Men as a general class have not been the victims of the kind of historic, pervasive discrimination that has disadvantaged other groups.

[2] "[S]ince sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility . . . ,' *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164, 175." *Frontiero* v. *Richardson*, 411 U. S. 677, 686.

[3] Apparently Oklahoma is the only State to permit this narrow discrimination to survive the elimination of the disparity between the age of majority for males and females.

females, it is actually perverse.[4]   The question then is whether the traffic safety justification put forward by the State is sufficient to make an otherwise offensive classification acceptable.

The classification is not totally irrational.   For the evidence does indicate that there are more males than females in this age bracket who drive and also more who drink. Nevertheless, there are several reasons why I regard the justification as unacceptable.   It is difficult to believe that the statute was actually intended to cope with the problem of traffic safety,[5] since it has only a minimal effect on access to a not very intoxicating beverage and does not prohibit its consumption.[6]   Moreover, the empirical data submitted by

---

[4] Because males are generally heavier than females, they have a greater capacity to consume alcohol without impairing their driving ability than do females.

[5] There is no legislative history to indicate that this was the purpose, and several features of the statutory scheme indicate the contrary.   The statute exempts license holders who dispense 3.2% beer to their own children, and a related statute makes it unlawful for 18-year-old men (but not women) to work in establishments in which 3.2% beer accounts for over 25% of gross sales.   Okla. Stat., Tit. 37, §§ 241, 243, 245 (1953 and Supp. 1976).

There is, of course, no way of knowing what actually motivated this discrimination, but I would not be surprised if it represented nothing more than the perpetuation of a stereotyped attitude about the relative maturity of the members of the two sexes in this age bracket.   If so, the following comment is relevant:

"[A] traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification.   Habit, rather than analysis, makes it seem acceptable and natural to distinguish between male and female, alien and citizen, legitimate and illegitimate; for too much of our history there was the same inertia in distinguishing between black and white.   But that sort of stereotyped reaction may have no rational relationship—other than pure prejudicial discrimination— to the stated purpose for which the classification is being made." *Mathews* v. *Lucas,* 427 U. S. 495, 520–521 (STEVENS, J., dissenting).

[6] It forbids the sale of 3.2% beer to 18–20-year-old men without forbidding possession, or preventing them from obtaining it from other sources,

the State accentuate the unfairness of treating all 18–20-year-old males as inferior to their female counterparts. The legislation imposes a restraint on 100% of the males in the class allegedly because about 2% of them have probably violated one or more laws relating to the consumption of alcholic beverages.[7] It is unlikely that this law will have a significant deterrent effect either on that 2% or on the law-abiding 98%. But even assuming some such slight benefit, it does not seem to me that an insult to all of the young men of the State can be justified by visiting the sins of the 2% on the 98%.

MR. JUSTICE BLACKMUN, concurring in part.

I join the Court's opinion except Part II–D thereof. I agree, however, that the Twenty-first Amendment does not save the challenged Oklahoma statute.

MR. JUSTICE STEWART, concurring in the judgment.

I agree that the appellant Whitener has standing to assert the equal protection claims of males between 18 and 21 years old. *Eisenstadt* v. *Baird,* 405 U. S. 438, 443–446; *Griswold* v. *Connecticut,* 381 U. S. 479, 481; *Barrows* v. *Jackson,* 346 U. S. 249, 255–260; *Buchanan* v. *Warley,* 245 U. S. 60, 72–73; see Note, Standing To Assert Constitutional Jus Tertii, 88 Harv. L. Rev. 423, 431–436 (1974). I also concur in the Court's judgment on the merits of the constitutional issue before us.

---

such as friends who are either older or female. Thus, the statute only slightly impedes access to 3.2% beer.

[7] The only direct evidence submitted by the State concerning use of beer by young drivers indicates that there is no substantial difference between the sexes. In a random roadside survey of drivers, 16.5% of the male drivers under 20 had consumed alcohol within two hours of the interview as opposed to 11.4% of the women. Over three-fourths of the nonabstainers in both groups expressed a preference for beer. And 14.6% of the men, as opposed to 11.5% of the women, had blood alcohol concentrations over .01%. See *ante,* at 203 n. 16.

Every State has broad power under the Twenty-first Amendment to control the dispensation of alcoholic beverages within its borders. *E. g., California* v. *LaRue,* 409 U. S. 109; *Joseph E. Seagram & Sons* v. *Hostetter,* 384 U. S. 35; *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.,* 377 U. S. 324, 330; *Mahoney* v. *Joseph Triner Corp.,* 304 U. S. 401; *State Board* v. *Young's Market Co.,* 299 U. S. 59. But "[t]his is not to say that the Twenty-first Amendment empowers a State to act with total irrationality or invidious discrimination in controlling the distribution and dispensation of liquor . . . ." *California* v. *LaRue, supra,* at 120 n. (concurring opinion).

The disparity created by these Oklahoma statutes amounts to total irrationality. For the statistics upon which the State now relies, whatever their other shortcomings, wholly fail to prove or even suggest that 3.2% beer is somehow more deleterious when it comes into the hands of a male aged 18–20 than of a female of like age. The disparate statutory treatment of the sexes here, without even a colorably valid justification or explanation, thus amounts to invidious discrimination. See *Reed* v. *Reed,* 404 U. S. 71.

MR. CHIEF JUSTICE BURGER, dissenting.

I am in general agreement with MR. JUSTICE REHNQUIST's dissent, but even at the risk of compounding the obvious confusion created by those voting to reverse the District Court, I will add a few words.

At the outset I cannot agree that appellant Whitener has standing arising from her status as a saloonkeeper to assert the constitutional rights of her customers. In this Court "a litigant may only assert his own constitutional rights or immunities." *United States* v. *Raines,* 362 U. S. 17, 22 (1960). There are a few, but strictly limited exceptions to that rule; despite the most creative efforts, this case fits within none of them.

This is not *Sullivan* v. *Little Hunting Park,* 396 U. S. 229 (1969), or *Barrows* v. *Jackson,* 346 U. S. 249 (1953), for there is here no barrier whatever to Oklahoma males 18–20 years of age asserting, in an appropriate forum, any constitutional rights they may claim to purchase 3.2% beer. Craig's successful litigation of this very issue was prevented only by the advent of his 21st birthday. There is thus no danger of interminable dilution of those rights if appellant Whitener is not permitted to litigate them here. Cf. *Eisenstadt* v. *Baird,* 405 U. S. 438, 445–446 (1972).

Nor is this controlled by *Griswold* v. *Connecticut,* 381 U. S. 479 (1965). It borders on the ludicrous to draw a parallel between a vendor of beer and the intimate professional physician-patient relationship which undergirded relaxation of standing rules in that case.

Even in *Eisenstadt,* the Court carefully limited its recognition of third-party standing to cases in which the relationship between the claimant and the relevant third party "was not simply the fortuitous connection between a vendor and potential vendees, but the relationship between one who acted to protect the rights of a minority and the minority itself." 405 U. S., at 445. This is plainly not the case here. See also *McGowan* v. *Maryland,* 366 U. S. 420, 429–430 (1961); *Brown* v. *United States,* 411 U. S. 223, 230 (1973).

In sum, permitting a vendor to assert the constitutional rights of vendees whenever those rights are arguably infringed introduces a new concept of constitutional standing to which I cannot subscribe.

On the merits, we have only recently recognized that our duty is not "to create substantive constitutional rights in the name of guaranteeing equal protection of the laws." *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1, 33 (1973). Thus, even interests of such importance in our society as public education and housing do not qualify as "fundamental rights" for equal protection purposes because they have no

textually independent constitutional status. See *id.*, at 29–39 (education); *Lindsey* v. *Normet*, 405 U. S. 56 (1972) (housing). Though today's decision does not go so far as to make gender-based classifications "suspect," it makes gender a disfavored classification. Without an independent constitutional basis supporting the right asserted or disfavoring the classification adopted, I can justify no substantive constitutional protection other than the normal *McGowan* v. *Maryland, supra,* at 425–426, protection afforded by the Equal Protection Clause.

The means employed by the Oklahoma Legislature to achieve the objectives sought may not be agreeable to some judges, but since eight Members of the Court think the means not irrational, I see no basis for striking down the statute as violative of the Constitution simply because we find it unwise, unneeded, or possibly even a bit foolish.

With MR. JUSTICE REHNQUIST, I would affirm the judgment of the District Court.

MR. JUSTICE REHNQUIST, dissenting.

The Court's disposition of this case is objectionable on two grounds. First is its conclusion that *men* challenging a gender-based statute which treats them less favorably than women may invoke a more stringent standard of judicial review than pertains to most other types of classifications. Second is the Court's enunciation of this standard, without citation to any source, as being that "classifications by gender must serve *important* governmental objectives and must be *substantially* related to achievement of those objectives." *Ante,* at 197 (emphasis added). The only redeeming feature of the Court's opinion, to my mind, is that it apparently signals a retreat by those who joined the plurality opinion in *Frontiero* v. *Richardson,* 411 U. S. 677 (1973), from their view that sex is a "suspect" classification for purposes of equal protection analysis. I think the Oklahoma statute challenged here need pass only the "rational basis" equal

protection analysis expounded in cases such as *McGowan* v. *Maryland,* 366 U. S. 420 (1961), and *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955), and I believe that it is constitutional under that analysis.

I

In *Frontiero* v. *Richardson, supra,* the opinion for the plurality sets forth the reasons of four Justices for concluding that sex should be regarded as a suspect classification for purposes of equal protection analysis. These reasons center on our Nation's "long and unfortunate history of sex discrimination," 411 U. S., at 684, which has been reflected in a whole range of restrictions on the legal rights of women, not the least of which have concerned the ownership of property and participation in the electoral process. Noting that the pervasive and persistent nature of the discrimination experienced by women is in part the result of their ready identifiability, the plurality rested its invocation of strict scrutiny largely upon the fact that "statutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members." *Id.,* at 686–687. See *Stanton* v. *Stanton,* 421 U. S. 7, 14–15 (1975).

Subsequent to *Frontiero,* the Court has declined to hold that sex is a suspect class, *Stanton* v. *Stanton, supra,* at 13, and no such holding is imported by the Court's resolution of this case. However, the Court's application here of an elevated or "intermediate" level scrutiny, like that invoked in cases dealing with discrimination against females, raises the question of why the statute here should be treated any differently from countless legislative classifications unrelated to sex which have been upheld under a minimum rationality standard. *Jefferson* v. *Hackney,* 406 U. S. 535, 546–547 (1972); *Richardson* v. *Belcher,* 404 U. S. 78, 81–84 (1971); *Dandridge* v. *Williams,* 397 U. S. 471, 484–485 (1970);

*McGowan* v. *Maryland, supra,* at 425–426; *Flemming* v. *Nestor,* 363 U. S. 603, 611 (1960); *Williamson* v. *Lee Optical Co., supra,* at 488–489.

Most obviously unavailable to support any kind of special scrutiny in this case, is a history or pattern of past discrimination, such as was relied on by the plurality in *Frontiero* to support its invocation of strict scrutiny. There is no suggestion in the Court's opinion that males in this age group are in any way peculiarly disadvantaged, subject to systematic discriminatory treatment, or otherwise in need of special solicitude from the courts.

The Court does not discuss the nature of the right involved, and there is no reason to believe that it sees the purchase of 3.2% beer as implicating any important interest, let alone one that is "fundamental" in the constitutional sense of invoking strict scrutiny. Indeed, the Court's accurate observation that the statute affects the selling but not the drinking of 3.2% beer, *ante,* at 204, further emphasizes the limited effect that it has on even those persons in the age group involved. There is, in sum, nothing about the statutory classification involved here to suggest that it affects an interest, or works against a group, which can claim under the Equal Protection Clause that it is entitled to special judicial protection.

It is true that a number of our opinions contain broadly phrased dicta implying that the same test should be applied to all classifications based on sex, whether affecting females or males. *E. g., Frontiero* v. *Richardson, supra,* at 688; *Reed* v. *Reed,* 404 U. S. 71, 76 (1971). However, before today, no decision of this Court has applied an elevated level of scrutiny to invalidate a statutory discrimination harmful to males, except where the statute impaired an important personal interest protected by the Constitution.[1] There being no such interest

---

[1] In *Stanley* v. *Illinois,* 405 U. S. 645 (1972), the Court struck down a statute allowing separation of illegitimate children from a surviving father

here, and there being no plausible argument that this is a discrimination against .females,[2] the Court's reliance on our previous sex-discrimination cases is ill-founded. It treats gender classification as a talisman which—without regard to the rights involved or the persons affected—calls into effect a heavier burden of judicial review.

The Court's conclusion that a law which treats males less favorably than females "must serve important governmental objectives and must be substantially related to achievement of those objectives" apparently comes out of thin air. The Equal Protection Clause contains no such language, and none of our previous cases adopt that standard. I would think we have had enough difficulty with the two standards of review which our cases have recognized—the

---

but not a surviving mother, without any showing of parental unfitness. The Court stated that "the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' "

In *Kahn* v. *Shevin,* 416 U. S. 351 (1974), the Court upheld Florida's $500 property tax exemption for widows only. The opinion of the Court appears to apply a rational-basis test, *id.,* at 355, and is so understood by the dissenters. *Id.,* at 357 (BRENNAN, J., joined by MARSHALL, J., dissenting).

In *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975), the Court invalidated § 202 (g) of the Social Security Act, which allowed benefits to mothers but not fathers of minor children, who survive the wage earner. This statute was treated, in the opinion of the Court, as a discrimination against female wage earners, on the ground that it minimizes the financial security which their work efforts provide for their families. 420 U. S., at 645.

[2] I am not unaware of the argument from time to time advanced, that all discriminations between the sexes ultimately redound to the detriment of females, because they tend to reinforce "old notions" restricting the roles and opportunities of women. As a general proposition applying equally to all sex categorizations, I believe that this argument was implicitly found to carry little weight in our decisions upholding gender-based differences. See *Schlesinger* v. *Ballard,* 419 U. S. 498 (1975); *Kahn* v. *Shevin, supra.* Seeing no assertion that it has special applicability to the situation at hand, I believe it can be dismissed as an insubstantial consideration.

norm of "rational basis," and the "compelling state interest" required where a "suspect classification" is involved—so as to counsel weightily against the insertion of still another "standard" between those two. How is this Court to divine what objectives are important? How is it to determine whether a particular law is "substantially" related to the achievement of such objective, rather than related in some other way to its achievement? Both of the phrases used are so diaphanous and elastic as to invite subjective judicial preferences or prejudices relating to particular types of legislation, masquerading as judgments whether such legislation is directed at "important" objectives or, whether the relationship to those objectives is "substantial" enough.

I would have thought that if this Court were to leave anything to decision by the popularly elected branches of the Government, where no constitutional claim other than that of equal protection is invoked, it would be the decision as to what governmental objectives to be achieved by law are "important," and which are not. As for the second part of the Court's new test, the Judicial Branch is probably in no worse position than the Legislative or Executive Branches to determine if there is *any* rational relationship between a classification and the purpose which it might be thought to serve. But the introduction of the adverb "substantially" requires courts to make subjective judgments as to operational effects, for which neither their expertise nor their access to data fits them. And even if we manage to avoid both confusion and the mirroring of our own preferences in the development of this new doctrine, the thousands of judges in other courts who must interpret the Equal Protection Clause may not be so fortunate.

## II

The applicable rational-basis test is one which

"permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than

others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan* v. *Maryland*, 366 U. S., at 425–426 (citations omitted).

Our decisions indicate that application of the Equal Protection Clause in a context not justifying an elevated level of scrutiny does not demand "mathematical nicety" or the elimination of all inequality. Those cases recognize that the practical problems of government may require rough accommodations of interests, and hold that such accommodations should be respected unless no reasonable basis can be found to support them. *Dandridge* v. *Williams*, 397 U. S., at 485. Whether the same ends might have been better or more precisely served by a different approach is no part of the judicial inquiry under the traditional minimum rationality approach. *Richardson* v. *Belcher*, 404 U. S., at 84.

The Court "accept[s] for purposes of discussion" the District Court's finding that the purpose of the provisions in question was traffic safety, and proceeds to examine the statistical evidence in the record in order to decide if "the gender-based distinction *closely* serves to achieve that objective." *Ante*, at 199, 200 (emphasis added). (Whether there is a difference between laws which "closely serv[e]" objectives and those which are only "substantially related" to their achievement, *ante*, at 197, we are not told.) I believe that a more traditional type of scrutiny is appropriate in this case, and I think that the Court would have done well here to heed its own warning that "[i]t is unrealistic to expect . . . members of the judiciary . . . to be well versed in the rigors of experimental or statistical technique." *Ante*, at 204. One

need not immerse oneself in the fine points of statistical analysis, however, in order to see the weaknesses in the Court's attempted denigration of the evidence at hand.

One survey of arrest statistics assembled in 1973 indicated that males in the 18–20 age group were arrested for "driving under the influence" almost 18 times as often as their female counterparts, and for "drunkenness" in a ratio of almost 10 to 1.[3]  Accepting, as the Court does, appellants' comparison of the total figures with 1973 Oklahoma census data, this survey indicates a 2% arrest rate among males in the age group, as compared to a .18% rate among females.

Other surveys indicated (1) that over the five-year period from 1967 to 1972, nationwide arrests among those under 18 for drunken driving increased 138%, and that 93% of all persons arrested for drunken driving were male;[4] (2) that youths in the 17–21 age group were overrepresented among those killed or injured in Oklahoma traffic accidents, that male casualties substantially exceeded female, and that deaths in this age group continued to rise while overall traffic deaths declined;[5] (3) that over three-fourths of the drivers under 20 in the Oklahoma City area are males, and that each of them, on average, drives half again as many miles per year as their female counterparts;[6] (4) that four-fifths of male drivers

---

[3] Extract from: Oklahoma Bureau of Investigation, Arrest Statistics for September, October, November, and December 1973. Defendants' Exhibit 1, Jurisdictional Statement A22. Extract from: Oklahoma City Police Department, Arrest Statistics for 1973. Defendants' Exhibit 2, Jurisdictional Statement A23. See ante, at 200 n. 8.

[4] Extract from: Federal Bureau of Investigation, Crime in the United States, 1972. Defendants' Exhibit 6, App. 182–184.

[5] Extract from: Oklahoma Department of Public Safety, Summary of Statewide Collisions for 1972, 1973. Defendants' Exhibits 4 and 5, Jurisdictional Statement A30–A31.

[6] Extract from: Oklahoma Management and Engineering Consulting, Inc., Report to Alcohol Safety Action Program (1973). Defendants' Exhibit 3, Table 1, Jurisdictional Statement A25.

under 20 in the Oklahoma City area state a drink preference for beer, while about three-fifths of female drivers of that age state the same preference; [7] and (5) that the percentage of male drivers under 20 admitting to drinking within two hours of driving was half again larger than the percentage for females, and that the percentage of male drivers of that age group with a blood alcohol content greater than .01% was almost half again larger than for female drivers.[8]

The Court's criticism of the statistics relied on by the District Court conveys the impression that a legislature in enacting a new law is to be subjected to the judicial equivalent of a doctoral examination in statistics. Legislatures are not held to any rules of evidence such as those which may govern courts or other administrative bodies, and are entitled to draw factual conclusions on the basis of the determination of probable cause which an arrest by a police officer normally represents. In this situation, they could reasonably infer that the incidence of drunk driving is a good deal higher than the incidence of arrest.

And while, as the Court observes, relying on a report to a Presidential Commission which it cites in a footnote, such statistics may be distorted as a result of stereotyping, the legislature is not required to prove before a court that its statistics are perfect. In any event, if stereotypes are as pervasive as the Court suggests, they may in turn influence the conduct of the men and women in question, and cause the young men to conform to the wild and reckless image which is their stereotype.

The Court also complains of insufficient integration of the various surveys on several counts—that the injury and death figures are in no way directly correlated with intoxication, *ante,* at 201 n. 9; that the national figures for drunk driving contain no breakdown for the 18–21-year-old group,

[7] *Id.,* at A27 (Table 3), A29 (Table 5).

[8] *Id.,* at A25 (Table 1). See *ante,* at 203 n. 16.

*ante,* at 201 n. 11; and that the arrest records for intoxication are not tied to the consumption of 3.2% beer, *ante,* at 201–202, nn. 11 and 12. But the State of Oklahoma—and certainly this Court for purposes of equal protection review—can surely take notice of the fact that drunkenness is a significant cause of traffic casualties, and that youthful offenders have participated in the increase of the drunk-driving problem. On this latter point, the survey data indicating increased driving casualties among 18–21-year-olds, while overall casualties dropped, are not irrelevant.

Nor is it unreasonable to conclude from the expressed preference for beer by four-fifths of the age-group males that that beverage was a predominant source of their intoxication-related arrests. Taking that as the predicate, the State could reasonably bar those males from any purchases of alcoholic beer, including that of the 3.2% variety. This Court lacks the expertise or the data to evaluate the intoxicating properties of that beverage, and in that posture our only appropriate course is to defer to the reasonable inference supporting the statute—that taken in sufficient quantity this beer has the same effect as any alcoholic beverage.

Quite apart from these alleged methodological deficiencies in the statistical evidence, the Court appears to hold that that evidence, on its face, fails to support the distinction drawn in the statute. The Court notes that only 2% of males (as against .18% of females) in the age group were arrested for drunk driving, and that this very low figure establishes "an unduly tenuous 'fit' " between maleness and drunk driving in the 18–20-year-old group. On this point the Court misconceives the nature of the equal protection inquiry.

The rationality of a statutory classification for equal protection purposes does not depend upon the statistical "fit" between the class and the trait sought to be singled out. It turns on whether there may be a sufficiently higher in-

cidence of the trait within the included class than in the excluded class to justify different treatment. Therefore the present equal protection challenge to this gender-based discrimination poses only the question whether the incidence of drunk driving among young men is sufficiently greater than among young women to justify differential treatment. Notwithstanding the Court's critique of the statistical evidence, that evidence suggests clear differences between the drinking and driving habits of young men and women. Those differences are grounds enough for the State reasonably to conclude that young males pose by far the greater drunk-driving hazard, both in terms of sheer numbers and in terms of hazard on a per-driver basis. The gender-based difference in treatment in this case is therefore not irrational.

The Court's argument that a 2% correlation between maleness and drunk driving is constitutionally insufficient therefore does not pose an equal protection issue concerning discrimination between males and females. The clearest demonstration of this is the fact that the precise argument made by the Court would be equally applicable to a flat bar on such purchases by *anyone*, male or female, in the 18–20 age group; in fact it would apply *a fortiori* in that case given the even more "tenuous 'fit' " between drunk-driving arrests and femaleness. The statistics indicate that about 1% of the age group population as a whole is arrested. What the Court's argument is relevant to is not equal protection, but due process—whether there are enough persons in the category who drive while drunk to justify a bar against purchases by all members of the group.

Cast in those terms, the argument carries little weight, in light of our decisions indicating that such questions call for a balance of the State's interest against the harm resulting from any overinclusiveness or underinclusiveness. *Vlandis* v. *Kline*, 412 U. S. 441, 448–452 (1973). The personal interest harmed

here is very minor—the present legislation implicates only the right to purchase 3.2% beer, certainly a far cry from the important personal interests which have on occasion supported this Court's invalidation of statutes on similar reasoning. *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632, 640 (1974); *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972). And the state interest involved is significant—the prevention of injury and death on the highways.

This is not a case where the classification can only be justified on grounds of administrative convenience. *Vlandis* v. *Kline, supra,* at 451; *Stanley* v. *Illinois, supra,* at 656. There being no apparent way to single out persons likely to drink and drive, it seems plain that the legislature was faced here with the not atypical legislative problem of legislating in terms of broad categories with regard to the purchase and consumption of alcohol. I trust, especially in light of the Twenty-first Amendment, that there would be no due process violation if no one in this age group were allowed to purchase 3.2% beer. Since males drink and drive at a higher rate than the age group as a whole, I fail to see how a statutory bar with regard only to them can create any due process problem.

The Oklahoma Legislature could have believed that 18–20-year-old males drive substantially more, and tend more often to be intoxicated than their female counterparts; that they prefer beer and admit to drinking and driving at a higher rate than females; and that they suffer traffic injuries out of proportion to the part they make up of the population. Under the appropriate rational-basis test for equal protection, it is neither irrational nor arbitrary to bar them from making purchases of 3.2% beer, which purchases might in many cases be made by a young man who immediately returns to his vehicle with the beverage in his possession. The record does not give any good indication of the true proportion of males in the age group who drink and drive (ex-

cept that it is no doubt greater than the 2% who are arrested), but whatever it may be I cannot see that the mere purchase right involved could conceivably raise a due process question. There being no violation of either equal protection or due process, the statute should accordingly be upheld.